# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION



| | |
|---|---|
| LORNA WOODALL, on her own behalf and by and for her minor child, BENJAMIN WOODALL | ) ) ) ) ) ) ) |
| BOARD OF EDUCATION, BELVIDERE COMMUNITY UNIT SCHOOL DISTRICT 100, and the BELVIDERE COMMUNITY UNIT SCHOOL DISTRICT 100 | ) ) ) ) ) ) |

04C50130

## COMPLAINT

Now comes the plaintiff, LORNA WOODALL, on her own behalf and by and for her minor child, Benjamin Woodall, by and through her attorney, The Law Office of John W. Gaffney, P.C., and for her complaint against the defendants, Board of Education, Belvidere Community Unit School District 100, and the Belvidere Community Unit School District 100, states as follows:

### NATURE OF ACTION

1)       The nature of this action is a suit, pursuant to 20 U.S.C. §1415(i)(3)(B),by a parent who is a "prevailing party" for the recovery of attorney's fees incurred at an administrative procedure brought to enforce the requirements of the Individuals With Disabilities Education Act, 20 U.S.C. §1400, *et.seq.*

DOCKETED
MAR 1 1 2004

## JURISDICTION AND VENUE

2)     Jurisdiction of this court is invoked pursuant to 20 U.S.C. §1415(i)(3)(A).

This action is authorized and instituted pursuant to Section 1415(i)(3)(B) of the

Individuals With Disabilities Education Act, which allows for the recovery of attorney's

fees by a parent who is a "prevailing party" at an administrative procedure brought to

enforce requirements of the Individuals With Disabilities Education Act, 20 U.S.C.

§1400, *et.seq.* The administrative hearing for which attorney's fees are being sought took

place within the jurisdiction of the Northern District of Illinois, Western Division, as the

hearing took place in Boone County, Belvidere, Illinois.

## PARTIES

3)     Plaintiff is the parent of Benjamin Woodall, a minor child who attends

school within the Boone County Community Unit School District 100.

4)     At all relevant times, the Board of Education, Belvidere Community Unit

School District 100, and the Belvidere Community Unit School District 100 are and have

been a public and/or private body, corporation and/or entity formed under the laws of the

State of Illinois for the purpose of administering the functioning of the elementary public

school system in Boone County, Belvidere, Illinois.

## STATEMENT OF CLAIMS

5)     On September 17, 2003, the Plaintiff requested a due process hearing, pursuant to 20 U.S.C. §1415(a), 34 C.F.R. 300.506-509 and applicable state law 105 I.L.C.S. ¶5/14.8.02(h), against the school district for failure to provide Benjamin Woodall with a free and appropriate public education.  The Defendant forwarded the Plaintiff's request to the Illinois State Board of Education on September 22, 2003.

6)     On September 25, 2003, a due process hearing officer was assigned to hear the matter and a due process hearing was set for both the Plaintiff and Defendant under Illinois State Board of Education docket number 3651.

7)     On November 14, 2003, a due process hearing was held to determine if the District had afforded Benjamin Woodall a free an appropriate public education, as required by the Individuals With Disabilities Education Act, 20 U.S.C. §1400, *et seq.*

8)     On November 16, 2003, after due consideration, the due process hearing officer rendered a decision on he merits, finding that the Defendant had failed to provide a free and appropriate public education to Benjamin Woodall on several issues raised at the due process hearing.  See, Decision and Order of November 16 2003, attached as exhibit A.

9)     That during the initiation an prosecution of said hearing, the Plaintiff, on behalf of her minor child, incurred substantial attorney's fees in the amount of $9,185.00.

10)     That the Plaintiff is a prevailing party within the meaning of 20 U.S.C. §1415(i)(3)(A) and  20 U.S.C. §1415(i)(3)(B) and is entitled to the recovery of attorney's fees incurred as a result of the administrative hearing brought to enforce the rights of

Benjamin Woodall under the Individuals With Disabilities Education Act.

WHEREFORE, the plaintiff respectfully requests this Honorable Court to find that the Plaintiff is a prevailing party within the meaning of 20 U.S.C. §1415(i)(3)(A) and 20 U.S.C. §1415(i)(3)(B) and is entitled to the recovery of attorney's fees in the amount of $9,185.00 plus costs and attorney's fees for the bringing of this suit.

Respectfully Submitted,

John W. Gaffney,
Attorney for the Plaintiffs

THE LAW OFFICE OF JOHN W. GAFFNEY, P.C.
103 West Sumner Street
Harvard, Illinois 60033
(815) 943-0900
FAX - (815) 943-7916
Attorney Number 6201141

EXHIBIT A

## ILLINOIS STATE BOARD OF EDUCATION
## IMPARTIAL DUE PROCESS HEARING

BENJAMIN WOODALL     )
             )
      **Student**   )
vs.            )  Case No. 3651
             )
BELVIDERE COMMUNITY UNIT   )
SCHOOL DISTRICT 100     )
             )
     **Local School District** )

CAROLYN ANN SMARON, Hearing Officer

### DECISION AND ORDER

### PROCEDURAL BACKGROUND

On September 17, 2003, counsel for the mother of the student requested an impartial due process hearing. ISBE received that request on September 22, 2003 and by letter dated September 25, 2003, CAROLYN ANN SMARON was appointed the hearing officer. The hearing officer contacted the parties to set a date and time for a prehearing conference and on October 3, 2003 the hearing officer served the parties with a Notice of Prehearing Conference. Counsel for the parties submitted prehearing disclosure regarding witnesses and documents. The prehearing conference took place on October 15, 2003. Jay R. Kraning represented the local school district. John W. Gaffney represented the interests of the parents of the student. The hearing was initially scheduled for October 24, 2003 but at the request of counsel for the local school district, the hearing was rescheduled to November 14, 2003.

### ISSUES PRESENTED AND REMEDIES REQUESTED
### AT PREHEARING CONFERENCE

**PARENT ISSUE #1:** The parents allege that the student has an impairment in hearing that adversely affects his educational performance and allege that the local school district's failure to find such a disability and develop an Individual Education Plan to meet the student's needs represents a denial of a free appropriate public education to this student.

**PARENT ISSUE #2:** Although the parties agree that the student has been properly identified as in need of special education and related services under the disability of "other health impaired", the parents allege that the student has not received the services set forth within the Individual Education Plan developed for this student

including but not limited the provision of a private tutor under circumstances outlined within the IEP.

**REQUESTED REMEDIES**: A finding that the student has an impairment in hearing that adversely affects his educational performance and an Order that an Individual Education Plan be developed in accordance with the testimony adduced at the hearing; Further the parents request that the local school district be ordered to reimburse the parents for the private evaluations and testimony of the private evaluators at the hearing in support of the allegation that the student has an impairment in hearing that adversely affects his educational performance.

With reference to the existing Individual Education Plan, the parents ask that there be a finding that the student has not received the services set forth within said Plan and an Order that the local school district provide compensatory services including but not limited reimbursement to the parents for private tutoring.

**LOCAL SCHOOL DISTRICT POSITION**: The local school district contends that it conducted an appropriate case study evaluation of the student and the assessment of the student did not support a finding that he was eligible for services as a hearing impaired student. Further, the local school district contends that the Individual Education Plan developed and the placement and level of services contained in that Individual Education Plan provide the student with a free appropriate public education in the least restrictive environment. Finally, the local school district contends that it has complied in all respects with the student's Individual Education Plan and thus the student is not entitled to any compensatory services or reimbursement of private tutoring expenses.

## FACTS

During the student's third grade academic year, the mother of the student requested a case study evaluation because she believed that her son was having difficulty hearing when background noise was present in the classroom. (Documents p.8) The evaluation was completed and the results considered at a Multidisciplinary Conference (MDC) held on June 5, 2001. (Documents pp.42-46) In addition to other information, the meeting participants considered a summary of a Central Auditory Processing Evaluation completed on February 5, 2001 at Northern Illinois University (Documents pp.15-23) and a Hearing Evaluation prepared by the Boone County Special Education Cooperative based on evaluations on May 30, 2001 and June 1, 2001. (Documents pp.37-40)

Kathleen Bogan-White testified that she is employed by the Northwestern Illinois Association. In that capacity she supervises and coordinates services for children who are hearing impaired in the northern ten counties of Illinois. By background, Ms.Bogan-White has an undergraduate degree in speech pathology and audiology and a masters degree in the area of children with hearing disabilities. Although she no longer evaluates

children, she trains other to evaluate and on occasion attends meetings to discuss the results of those evaluations. Ms. Bogan White attended the MDC on June 5, 2001. At the conclusion of the June 5, 2001 meeting, the MDC team concluded that the student was not eligible for special education. The decision of the MDC team is not in dispute in this hearing.

During the student's fourth grade academic year, the mother of the student again requested a case study evaluation. (Documents p.67) At a meeting held on January 30, 2002, the school district identified the additional evaluation data to be collected and the mother gave her consent to collect this additional data. (Documents pp.71-72) The evaluation was completed and the results not considered until the beginning of the student's next academic year. There is no dispute at this hearing regarding the apparent delay in time.

During the student's fifth grade year, a meeting was held on October 30, 2002 to discuss the second evaluation of the student. In addition to other information, the meeting participants considered an Illinois Department of Public Health screening audiogram dated September 24, 2002 (Documents p.97). It was the consensus of the meeting participants that the student was not eligible for special education. (Documents pp. 117-122)

On October 30, 2002, the mother of the student gave her consent to collect additional data (Documents pp.115-116) and the results were considered at a meeting held on December 20, 2002. In addition to other information, the meeting participants considered a Hearing Report dated November 20, 2002 prepared by the Boone County Special Education Cooperative (Documents pp.141-144) and an Audiology Report dated November 25, 2002 prepared by Heidi Klug, an audiologist employed by the Northwestern Illinois Association. (Documents pp.149-151).

Ms. Bogan White also attended the meeting on December 20, 2002 and testified that in preparation for that meeting, she was able to review the aforesaid Northern Illinois University Central Processing Disorder Evaluation. Ms. Bogan-White reported to the meeting participants and testified in this hearing that she believed that the Audiology Report prepared by Heidi Klug was consistent with the results obtained previously by Northern Illinois University and the Boone County Special Education Cooperative. She further testified that the student's previous weak areas had matured and were no longer present. Ms. Bogan-White testified that she had seen no medical records indicating that the student had either a sensory neural or conductive hearing loss. In her opinion, the student was not hearing impaired and did not have a central auditory processing disorder. At the conclusion of the meeting, the evaluation team concluded that the student was not eligible for special education (Documents pp.161-167). The decision of the team is not in dispute in this hearing.

3

Heidi Klug testified that she is employed by the Northwestern Illinois Association as an audiologist and in that capacity evaluated the student. In preparation for her evaluation, Ms. Klug reviewed the aforesaid Northern Illinois University Central Auditory Processing Evaluation and noted that no hearing impairment or central processing was found at that time. In addition, she reviewed audiograms dated October 17, 2000, October 19, 2000 and September 24, 2002. (Documents pp.6-7,97) In reviewing the previous central auditory processing disorder evaluation, she testified that she noted that in a few areas, the student was below the normal range but that typically an evaluator will utilize a battery of tests, look at the results as a whole, and look for a pattern. Ms. Klug testified that the evaluation noted no pattern suggesting either a hearing impairment or central auditory processing disorder. Ms. Klug also reviewed the aforesaid Hearing Evaluation prepared by the Boone County Special Education Cooperative based on evaluations on May 30, 2001 and June 1, 2001. (Documents pp.37-40). Ms. Klug testified that she discounted the results of the G-F-W Auditory Selective Attention Test as students typically do not perform well on the test and the test itself is not used often when assessing student's hearing. Ms. Klug testified that her report is consistent with every single evaluation, report and test reviewed by her and in her opinion, the student is not hearing impaired and does not have a central auditory processing disorder.

On January 29, 2003, the student was evaluated for a sleep disorder and was recommended for an ENT evaluation. (Documents pp.172-173) and on February 6, 2003 the student was found to have frequent hypopneas. (Documents p.176) A meeting was scheduled to discuss the student's eligibility for special education on May 13, 2003. The principal of Central Middle School and a sixth grade middle school teacher was invited to but did not attend the meeting. (Documents p.186) At that meeting, the participants considered the hypopnea diagnosis; the Diamond Headache Clinic diagnosis of chronic daily headaches dated October 30, 2001 (Documents pp.52-53), and the asthma diagnosis and concluded that the student was eligible for special education under the disability known as "other health impaired". The meeting participants thereafter prepared an Individualized Education Plan (IEP) (Documents pp.192-202) and developed a single educational goal for the student to-wit: the student will increase work completion in sixth grade. The goal was to be implemented in sixth grade through the use of modifications and accommodations and consultation regarding those modifications and accommodations was to be provided by the sixth grade resource teacher. (Documents p.196) The student's placement was to be a regular education classroom with consult services from the sixth grade resource teacher.

In that regular education setting, the student was to (1) have his curriculum modified, (2) his homework tailored, (3) receive frequent checks for understanding, (4) receive preferential seating and (5) receive accommodations in the area of spelling. (Documents p.199) The student was to receive instructional modifications/accommodations in the areas of Language Arts/English, Mathematics,

4

Biological/Physical Science, Social Sciences, Fine Arts, and Physical Education. Specifically, the student's instruction was to be modified in the following manner:

1.  number of items on worksheets to be reduced
2.  spelling accommodations
3.  study guides to be provided
4.  highlighted copies of study guides to be provided for tests and quizzes
5.  length of assignments to be reduced
6.  full and partial notes to be provided
7.  an adjusted grading scale was to be used

In the areas of medical concern (asthma, headaches, hypopnea), the nurse was to implement the "Care Plan". (Document p.202) On May 29, 2003, the IEP was amended to establish that the student would receive "Homebound Services" if the student was absent from school two or more days in a week with the services to be provided on Friday with the specific times to be established in Fall, 2003 (Document pp.206-215)

The student's sixth grade school year started on September 2, 2003 where he was assigned to the Crusader Sixth Grade Team. From September 2, 2003 through October 23, 2003, the student was absent eighteen of the first thirty-six days and in every week, was absent at least two days. (Documents p.223) On September 17, 2003, counsel for the mother requested an impartial due process hearing with the request that there be no further contact between Central Middle School personnel and the parent of the student. (Documents p.225)

The student's Progress Report as of October 17, 2003 reflected that the student had the following grades:

| | |
|---|---|
| Band | C |
| English | F |
| Mathematics | C |
| Music | A |
| Physical Education | M |
| Reading | F |
| Science | F |
| Social Studies | C |

Where the student received a grade of "F", the teachers reported that his absences hindered his grade or reported that the student had missing assignments.

In the latter part of October, 2003, the student was provided with a list of the assignments for the grading period, an indication of the scores received, and an indication of the missing assignments, for which the student received a grade of "F". (Documents

5

pp.273-274, Parent's Exhibits C, D, and E)  On November 4, 2003, the student's report card was issued with the following grades:

| | |
|---|---|
| Band | B |
| English | Incomplete |
| Mathematics | Incomplete |
| Music | C+ |
| Physical Education | M |
| Reading | Incomplete |
| Science | Incomplete |
| Social Studies | Incomplete |

In every case, the student's teachers indicated that the student's missed assignments hindered his grade. (Documents p.292)

Marybeth Sundberg testified that she is the special education resource teacher assigned to the Crusader Team and therefore was the "resource teacher" indicated within the student's IEP.  Ms. Sundberg testified that the team members meet daily to discuss matters of interest to the Crusader Team.  With respect to this student, Ms. Sundberg testified that she has reviewed the student's IEP and viewed her job responsibilities as follows: monitor the student's progress in the classroom and advise the team that the student was to receive an "unlimited" time to complete his assignments.  Ms. Sundberg was aware of the spelling "accommodation" implemented by the student's English teacher, was aware that the student was receiving no deduction for late completion of assignments, was aware that the student had attended Homework Club once.  Ms. Sundberg had no knowledge as to which required modifications were provided to the student on a regular basis by his regular education classroom teachers.

Jennifer Brown testified that she is the student's sixth grade Reading teacher and is familiar with the student's IEP, the student's asthmatic condition and chronic headaches, and is aware of an "asthma action plan".  Ms. Brown has never observed the student to be in any respiratory distress, has never called "911" for the student, and has never had to call the Nurse to her room.  With regard to her classroom, Ms. Brown indicated that she provides the following "accommodations" to the student:

1. extended time for completion of assignments
2. offered the "homework club" to the student
3. provides preferential seating
4. writes homework on the board

With regard to absences, the student is treated just like any other student in her classroom in that he is expected to go to a particular area, pull the missing assignments, and return the completed assignments to the teacher.  Ms. Brown testified that the Crusader Team prepares a weekly schedule of activities in all academic areas and upon

6

request, provides that information to a parent of an absent student. Parent's Exhibit B is an example of such a weekly schedule. With respect to the classroom "modifications" required by the student's IEP, Ms. Brown testified that she had not reduced the items on any assignment, test or quiz because she does not have sufficient data to do so i.e. does know what the student is capable of doing so cannot reduce the work required. Ms. Brown testified that she cannot provide study guides (highlighted or otherwise) because she does not prepare study guides. Ms. Brown testified that she has not provided the student with full or partial notes. Finally, Ms. Brown testified that in the weekly preparation of the weekly chart, the "must do" assignments are now marked with an "*".

Stephanie Bye testified that she is the student's sixth grade English teacher and the "team leader" of the Crusader Team. Ms. Bye is aware of the student's IEP, asthmatic condition and chronic headaches, and is aware of an "asthma action plan". Ms. Bye has never observed the student to be in any respiratory distress, has never called "911" for the student, and has never had to call the Nurse to her room. With regard to her classroom, Ms. Bye indicated that she provides the following "accommodations" to the student: modifies the student's spelling test results so that if he should receive lower than a C, she increases the grade to a "C", provides unlimited time for completion of assignments, and does not modify the content or difficulty of the student's work because the work she does receive from the student is of superior quality.

With regard to absences, the student is treated just like any other student in her classroom in that he is expected to go to a particular area, pull the missing assignments, and return the completed assignments to the teacher. Ms. Bye testified that the Crusader Team prepares a weekly schedule of activities in all academic areas and upon request, provides that information to a parent of an absent student. Parent's Exhibit B is an example of such a weekly schedule.

With respect to the classroom "modifications" required by the student's IEP, Ms. Bye testified that she had not reduced the items on any assignment, test or quiz. Ms. Bye testified that she cannot provide study guides (highlighted or otherwise) because she does not prepare study guides and with specific reference to Spelling, does not provide the weekly spelling words to the student any earlier than she provides those words to her other students. Ms. Bye testified that she has not provided the student with full or partial notes. Ms. Bye testified that in the weekly preparation of the weekly chart, the "must do" assignments are now marked with an "*". Finally, Ms. Bye testified that the students on her team, including this student, are unaware that a document similar to Exhibit B is prepared on a weekly basis and are unaware that they can request a copy of the weekly plan.

Lois Muehlfelder testified that she is the student's sixth grade Social Studies teacher and is familiar with the student's IEP, the student's asthmatic condition and chronic headaches, and is aware of an "asthma action plan". Ms. Muehlfelder has never observed the student to be in any respiratory distress, has never called "911" for the

student, and has never had to call the Nurse to her room. With regard to her classroom, Ms. Muehlfelder indicated that she provides the following "accommodations" to the student:

1.  preferential seating
2.  unlimited time to complete assignments
3.  issue duplicate social studies textbook for student's home

With regard to absences, the student is treated just like any other student in her classroom in that he is expected to go to a particular area, pull the missing assignments, and return the completed assignments to the teacher. Ms. Muehlfelder testified that the Crusader Team prepares a weekly schedule of activities in all academic areas and upon request, provides that information to a parent of an absent student. Parent's Exhibit B is an example of such a weekly schedule.

With respect to the classroom "modifications" required by the student's IEP, Ms. Muehlfelder testified that she had not reduced the items on any assignment, test or quiz. Ms. Muehlfelder testified that she cannot provide study guides (highlighted or otherwise) because she does not prepare study guides. Ms. Brown testified that she has not provided the student with full or partial notes but did permit the student to copy her notes one time. Finally, Ms. Brown testified that in the weekly preparation of the weekly chart, the "must do" assignments are now marked with an "*".

Erin Hathaway testified that she is the student's sixth grade Science teacher and is familiar with the student's IEP, the student's asthmatic condition and chronic headaches, and is aware of an "asthma action plan". Ms. Hathaway has never observed the student to be in any respiratory distress, has never called "911" for the student, and has never had to call the Nurse to her room. With regard to her classroom, Ms. Hathaway indicated that she provides the following "accommodations" to the student:

1.  preferential seating
2.  "unlimited" time to complete assignments, limited to end of grading period.
3.  all new vocabulary on "word wall" in the classroom

With regard to absences, the student is treated just like any other student in her classroom in that he is expected to go to a particular area, pull the missing assignments, and return the completed assignments to the teacher. Ms. Hathaway testified that the Crusader Team prepares a weekly schedule of activities in all academic areas and upon request, provides that information to a parent of an absent student. Parent's Exhibit B is an example of such a weekly schedule.

With respect to the classroom "modifications" required by the student's IEP, Ms. Hathaway testified that she had not reduced the items on any assignment, test or quiz.

8

Ms. Hathaway testified that she cannot provide study guides (highlighted or otherwise) because she does not prepare study guides. Ms. Hathaway testified that she has not provided the student with full or partial notes. Finally, Ms. Brown testified that in the weekly preparation of the weekly chart, the "must do" assignments are now marked with an "*". Ms. Hathaway testified that it is very difficult to shorten assignments within her classroom without compromising the student's acquisition of the next material. Ms. Hathaway has never consulted with the resource teacher regarding how to implement the IEP modifications within her classroom.

Elizabeth Westlund testified that she is the School Nurse for Central Middle School and in that capacity is responsible for implementing the student's "asthma action plan". Ms. Westlund was familiar with the student as she was assigned to Perry Elementary School during the student's fifth grade year and in that capacity was responsible for implementing the student's "asthma action plan". Ms.Westlund testified that the student carries an inhaler with him at all times and a duplicate inhaler is kept in her office. According to Ms. Westlund, the mother provided her with a peak flow meter for her use in assessing the student's lung capacity. Although there is no prescription (Rx) from a physician requiring daily peak flow reading, Ms. Westlund testified that when the student is present in sixth grade, she calls the student down to her office for those readings.

Ms. Westlund testified that she considered a document dated September 3, 2003 - Featherstone Clinic S.C. (Documents pp.277-280) to be the "care plan" within the student's IEP and also the student's current "asthma action plan". Ms.Westlund testified that the aforesaid document does not require daily peak flow readings but at the request of the mother of the student, she does take these daily readings when the student is present in school. Ms. Westlund has never observed the student to be in respiratory distress, has never been called to any of the Crusader Team classrooms for the student, has never called "911" for the student and, with reference to the peak flow meter readings, the majority of the readings are in the "green" zone. Further, Ms. Westlund has never observed or had it reported to her by the student or any of his teachers that the student was fatigued or suffering from a headache.

During the student's fifth grade year, Ms. Westlund viewed the document entitled Asthma Action Plan prepared by Dr. Charles Frey on April 3, 2002 (Documents pp.86-87) to be the "student's asthma action plan/care plan". That document specifies that peak flow meter measurements will be obtained if the student is having problems with asthma. Ms. Westlund testified that in fifth grade, she measured the student's lung capacity on a daily basis at the request of the student's mother.

Kathleen Magill testified that she is the Director of Special Education for the Boone County Special Education Cooperative. Ms. Magill has a bachelors degree in the areas of speech pathology/audiology, a masters decree in speech pathology and twenty-nine years of experience in the field of education. She first became aware of the student

in October, 2002 when she learned of a controversy regarding the scheduling of a meeting to discuss the findings of an evaluation of this student. Ms. Magill attended the October 30, 2002 meeting where the IEP team revisited the issue as to whether the student was hearing impaired. Based upon the information provided to the team and in light of her educational background, Ms. Magill was then of the opinion that the student was not hearing impaired and did not have a central auditory processing disorder.

Ms. Magill also attended the December 20, 2003 meeting where the IEP team considered additional information regarding the student's health conditions and requested additional information from the mother of the student. Ms. Magill attended the May 13, 2003 where the evaluation team found the student eligible for special education for medical reasons (hypopnea, asthma, and chronic headaches). Ms. Magill also attended the May 29, 2003 meeting where the IEP was amended to provide for the homebound services previously discussed.

Ms. Magill testified that she did not arrange for the homebound instruction for the student at Central Middle School because

    (a)     she could not locate the tutor requested by the mother
    (b)     she could not contact the mother of the student because the due process request was accompanied by a directive not to contact the mother

With respect to the student's IEP, Ms. Magill remains of the opinion that the IEP, as written and if implemented, would provide the student with educational benefit and would comply with the requirements of the Individuals with Disabilities Education Act.

Michelle Woosley testified that she tutored the student during the summer 2003 pursuant to the May 28, 2003 IEP amendment to-wit: 20 hours maximum at district #100 tutor rate during summer 2003. (Documents p.209) Ms. Woosley testified that she asked the school district for the student's missing assignments but did not receive this information. Instead, Ms. Woosley started going through the student's textbooks, inquiring of the student and his mother what he had missed. In her opinion, the student seemed to grasp the concepts quickly and seemed eager to complete the assignments.

Ms. Woosley noticed that once sixth grade started, the student's demeanor changed in that he was no longer eager to attend school and seemed to have given up. Ms. Woosley reviewed Exhibit B tendered by the school district as an example of the weekly "organizer" and testified that she did not find it helpful in providing homebound services to the student. Ms. Woosley testified that there was no way for her to interpret "group expectations" for mathematics, "newspaper activity" for reading, "turn in conversion bookmark" for science, etc. Finally, Ms. Woosley testified that if would have been helpful if the student had been provided a second set of books for homebound tutoring.

The mother of the student testified and provided anecdotal evidence in support of her allegation that the student is hearing impaired. With respect to the student's IEP dated May 13, 2003, the mother testified that she participated in the preparation of the curricular modifications and relied upon those modifications being implemented at Central Middle School. Regarding the "Care Plan" reference on p.11 of the May 13, 2003 IEP, the mother of the student believed that the then existing Asthma Action Plan would be attached to and made a part of the IEP. With reference to the accommodations and modifications, the mother of the student confirmed that there has been no reduction in her son's workload, no highlighted study guides prior to tests or quizzes, no study guides, no teacher's notes. With regard to the weekly organizer, the mother testified that she received only one, the document tendered at the hearing, and then at the end of that week. With reference to the "asthma action plans", the mother testified that neither plan specifically requires a daily peak flow meter. Rather, the mother testified that she believes the daily reading is implicit in the plan. Currently, the mother testified that her son does not wish to attend school. Rather, he is anxious and depressed. The mother testified that he was particularly depressed by the progress reports previously referred to as Parent's C, D and E which indicated the amount of "incomplete" assignments.

## APPLICABLE LAW

The law applicable to the facts in this case is set forth in the Individuals with Disabilities Education Act (IDEA), 20 USC §1401 et seq., the federal regulations to IDEA, 34 CFR Part 300, the School Code of Illinois, 105 ILCS §5/14-8.02 et seq., and the applicable state regulations, 23 Ill.Admin.Code Part 226. The local school district bears the burden of proof that at all times relevant it properly identified the nature and severity of the student's suspected disabilities and if appropriate, that it offered the student a free appropriate public education in the least restrictive environment, consistent with procedural safeguards.

In **Board of Education, Hendrick Hudson Central School District. v. Rowley,**. 458 US 176 (1982) ("Rowley"), the Supreme Court set forth a two pronged test for evaluating whether or not the school district has complied with applicable special education laws - there must be compliance with statutory procedures and then the individualized education program (IEP) developed through such procedures must be reasonably calculated to enable the student to receive educational benefit.

Hearing Impairment: an impairment in hearing, whether permanent or fluctuating, that adversely affects a child's educational performance but that is not included under the definition of deafness. 23 Ill.Admin.Code §226.75.

Other Health Impairment: limited strength, vitality or alertness, including a heightened sensitivity to environmental stimuli, that results in limited alertness with respect to the educational environment, that is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder,

diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, and sickle cell anemia; and adversely affects a child's educational performance. 23 Ill.Admin.Code §226.75.

## APPLICATION OF LAW TO THE FACTS

There is overwhelming documentation and testimony that the student is not hearing impaired and does not have a central auditory processing disorder. The mother of the student presented anecdotal evidence in support of her position and it was insufficient to rebut the school district's position.

There is no dispute that the student was properly found eligible for special education and related services under the category "other health impaired" - he has a chronic health condition which adversely affects his educational performance. One need go no further than the student's record of attendance to judge the impact of his condition: eighteen days absent out of thirty-six schools. One need go no further than the student's report card, a report card filled with "incompletes", to judge the impact of his condition in the absence of accommodations and modifications.

But wait, there **was** an Individualized Education Plan in place to address the impact of his chronic health condition. And by the Director of Special Education's own admission, the student's Individualized Education Plan could be implemented at Central Middle School and if implemented would have provided the student with the free appropriate public school education to which he is entitled. But the question remains: was the Individualized Education Plan implemented?

We learn from the testimony of the Central Middle School Crusader Team that they met before school started to review the students assigned to their team and, with respect to the students who had Individualized Education Plans, discussed the implementation of those Plans. We learned from the testimony that the Reading, Science, Social Studies, English and presumably the other members of the team were all aware of the May, 2003 Individualized Education Plan for this student. We can presume that all of the student's teachers were aware that the student was to (1) have his curriculum modified, (2) his homework tailored, (3) receive frequent checks for understanding, (4) receive preferential seating and (5) receive accommodations in the area of spelling. (Documents p.199) We can presume that all of the student's teachers were aware that the student was to receive instructional modifications/accommodations in the areas of Language Arts/English, Mathematics, Biological/Physical Science, Social Sciences, Fine Arts, and Physical Education. Specifically, the student's instruction was to be modified in the following manner:

1.  number of items on worksheets to be reduced
2.  spelling accommodations
3.  study guides to be provided

4.   highlighted copies of study guides to be provided for tests and quizzes
5.   length of assignments to be reduced
6.   full and partial notes to be provided
7.   an adjusted grading scale was to be used
8.   the student was to receive "Homebound Services" if he was absent from school two or more days in a week with the services to be provided on Friday with the specific times to be established in Fall, 2003

However, it would appear that the resource teacher was confused as to her role as a "consultant" to the team. It would also appear that the student's teachers were confused as to the role of the resource teacher as a "consultant" to the team. And it appears that all members of the Crusader team were confused about the import of an Individualized Education Plan. The teachers' testimony was replete with statements that they did not do something because they did not believe the services to be required, did not believe that the student required those services, or just did not provide the services.

For example, the student's reading teacher provided preferential seating and unlimited time to complete his assignments. This behavior flies in the face of an IEP developed for a student with a chronic condition which required her to shorten assignments - not give unlimited time to complete the same assignments given to every other regular education student on the team. For that matter, every teacher seemed to believe that "unlimited time" was the answer to the question of "what did you do for this student in your classroom?" Nowhere within the Individualized Education Plan was any teacher required to give the student unlimited time for his assignments.

For example, the English teacher seemed to view "grade adjustment" as the perfect solution to the requirement that the student receive a spelling "accommodation". Apparently this teacher, like the remaining members of her team, completely missed the requirement that the student's assignments must be modified, both in length and content.

For example, all of the teachers participated in a weekly organization chart which was made available to no one unless the student was absent- even the students apparently are unaware of its existence. And when one examines this weekly organization chart, it is painfully obvious that it is a broad outline and no more of where this team is going for that week. Another teacher of sixth grade students would have no idea what specifically was being taught, what was expected of the students - that information could be found within the teacher's lesson plan which presumably contains the detailed references to goals and objectives, curriculum references, references to textbooks and worksheets for the week. But that information was never made available to the student or his homebound tutor. In short, the student's homebound tutor found this weekly chart to be interesting but not helpful.

With references to absences, the very "indicator" of the student's chronic health condition, the team treated this student just like any other absent student - completely

ignoring the homebound tutoring requirement. Apparently it did not occur to the "consultant", the resource teacher, or to the team leader, to question how they should implement and coordinate this service for the student.

Every single member of this student's team were of the opinion that they need not provide study guides because they do not have study guides available. Presumably the team members knew that they did not have study guides available when they met prior to the first day of school. There is not one shred of evidence indicating that these teachers "consulted" with the resource teacher regarding this dilemma nor is there any shred of evidence indicating that these teachers discussed this among themselves during their daily and weekly meetings. Apparently this team concluded that they were not required to provide what the student's Individualized Education Plan required them to provide i.e. accommodations and modifications.

The most well intentioned employee of the school district was the School Nurse who, in the face of conflicting "asthma action plans", neither of which required daily use of the peak flow meter, chose to respect the wishes of the mother and provide this daily service.

With reference to the "homebound" tutoring, the Director of Special Education was one of three participants at the May 29, 2003 meeting where the student's Individualized Education Plan was amended. The "homebound" tutoring provision was very specific: homebound tutoring was to be set up for the student if he is absent two or more days in a week, with the services to occur on Friday, and the specific times to be established in the Fall, 2003. The services could occur after school on Friday for one hour to a maximum of (unclear) hours. But, nothing was in place at the beginning of school. There was nothing contemplated in terms of providing the tutor with meaningful information in the event of an absence. It is hard to imagine what services were to be provided under the category of "homebound" tutoring in light of the content of the weekly planners. But, had the school district even attempted to have this service in place, the parties could have very quickly determined what "modifications" might have been required to make this "homebound" tutoring a meaningful accommodation to a student with a chronic illness.

In conclusion, it would appear that the Individual Education Plan was prepared in compliance with all appropriate procedural requirements (or if not, none were objected to by the mother of the student) but the implementation of that Plan was fraught with error. Those errors have apparently changed an easygoing, willing student into an anxious, depressed student who currently has little desire to attend school. This situation is ripe for compensatory services.

In **Board of Education, Hendrick Hudson Central School District. v. Rowley,**. 458 US 176 (1982) ("Rowley"), the Supreme Court set forth a two pronged test for evaluating whether or not the school district has complied with applicable special

education laws - there must be compliance with statutory procedures and then the individualized education program (IEP) developed through such procedures must be reasonably calculated to enable the student to receive educational benefit. In the instant case, the school district complied with statutory procedures and then developed an individualized education program which they admit was reasonably calculated to enable to receive educational benefit. When the Crusader team failed to implement the required accommodations and modifications, the student did not receive what the law requires - a free appropriate public education. When the special education cooperative failed to implement the required homebound services, the student did not receive what the law requires - a free appropriate public education. When the resource teacher misperceived her duty to "consult", the student did not receive what the law requires - a free appropriate public education.

## DECISION

IT IS HEREBY ORDERED that the school district has met its burden and a finding is made that the school district conducted an appropriate case study evaluation of this student and the assessment of this student did not support a finding that he was eligible for services as a hearing impaired student or as a student with a central auditory processing disorder.

IT IS FURTHER ORDERED that the parent has met her burden and a finding is made that the school district has not complied with the Individualized Education Plan developed for this student. and as a consequence the school district has denied this student a free appropriate public education. The school district shall immediately (1) reimburse the mother for the cost of tutoring to-date by Michelle Woosley and (2) implement the student's Individualized Education Plan to-wit:

In that regular education setting, the student must (1) have his curriculum modified, (2) his homework tailored, (3) receive frequent checks for understanding, (4) receive preferential seating and (5) receive accommodations in the area of spelling. The student must receive instructional modifications/accommodations in the areas of Language Arts/English, Mathematics, Biological/Physical Science, Social Sciences, Fine Arts, and Physical Education. Specifically, the student's instruction must be modified in the following manner:

1. number of items on worksheets to be reduced
2. spelling accommodations
3. study guides to be provided
4. highlighted copies of study guides to be provided for tests and quizzes
5. length of assignments to be reduced
6. full and partial notes to be provided
7. an adjusted grading scale was to be used

All of the foregoing are to be provided by the student's regular education teachers in consultation with the Crusader team's resource teacher. Should the resource teacher

not be able to accomplish the foregoing within the specified number of minutes of consultative services set forth within the Individualized Education Plan, the IEP team shall reconvene and amend the number of minutes required for consultation. In addition, should the student be absent for two or more days in any week, the school district and/or the special education cooperative shall arrange for the implementation of the homebound services. The nature of those services is set forth below.

As compensatory services for the failure to meet this student's needs for the months of September, October and November, 2003, the school district is ordered to immediately provide the student with a full time tutor for the remainder of this marking period. The tutor shall become a member of the Crusader team to such an extent that he or she will become conversant with the sixth grade curriculum, the sixth grade textbooks, workbooks, and all other educational tools. The tutor shall provide homebound tutoring to the student on those days when the student is unable to attend school and shall accompany the student to school when he does attend school so that he or she can monitor what transpires in the classroom setting. At the end of this marking period, the student will return to the program outlined for the student within his Individualized Education Plan e.g. classroom modifications and homebound services when the student is absent for two or more days in a week. On her part, the student's parent is ordered to work with the school to do everything necessary to encourage the student's attendance and to encourage the student in the belief that the school district now intends to meet his needs.

IT IS FINALLY ORDERED that the school nurse has complied in all respects with the "asthma action plan" set forth within the Asthma Action Plan dated September 3, 2003 submitted by Dr. Charles Frey, Jr. and there is no direction within that Plan requiring daily peak flow meter readings.

## RIGHT TO REQUEST CLARIFICATION

Either party may request clarification of this decision by submitting a written request for such clarification to the undersigned hearing officer within five (5) days of receipt of this decision. The request for clarification shall specify the portions of the decision for which clarification is sought and a copy of the request shall be mailed to the party and to the Illinois State Board of Education, Program Compliance Division, 100 North First Street, Springfield, Illinois 62777. **The right to request such a clarification does not permit a party to request reconsideration of the decision itself and the hearing officer is not authorized to entertain a request for reconsideration.**

## RIGHT TO FILE A CIVIL ACTION

This decision shall be binding upon the parties unless a civil action is commenced. Any party to this hearing aggrieved by this decision has the right to

ILCS 5/14-8.01(i), that civil action shall be brought in any court of competent jurisdiction within 120 days after a copy of this decision was mailed to a party.

**ISSUED this 16th day of November 2003.**

CAROLYN ANN SMARON
Due Process Hearing Officer

## CERTIFICATE AND AFFIDAVIT OF DELIVERY BY MAIL

The undersigned hereby certifies that a copy of the Decision and Order was served as follows:

(certified mail and email: jkraning@hlerk.com)
Mr. Jay R. Kraning
Attorney at Law
3030 Salt Creek Lane, Suite 202
Arlington Heights, Illinois 60005

(certified mail and email: jwgaffney@hotmail.com)
Mr. John W. Gaffney
Attorney at Law
103 West Sumner Street
Harvard, Illinois 60033

(email: dboyd@isbe.net)
Mr. Dale Boyd
Due Process Coordinator
Illinois State Board of Education
100 North First Street
Springfield, IL 62777-0001

before 5:00 p.m. on November 17, 2003.

*C A N Smaron*

Carolyn Ann Smaron
Due Process Hearing Officer
635 Argyle Avenue
Flossmoor, Illinois 60422
708 798 0966 (facsimile 708 798 3430)

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS–44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I.(a) PLAINTIFFS
*Lorna Woodall*

### DEFENDANTS
*Board of Education, Belvidere Community Unit School District 100*

U.S. DISTRICT COURT

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF *Boone*
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT *Boone*
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
*The Law Office of John W. Gaffney*
*103 W. Sumner*
*Harvard, Il. 60033 (815) 943-0900*

ATTORNEYS (IF KNOWN)

## 04C50130

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☑ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☑ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☑ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury — Med. Malpractice
- ☐ 365 Personal Injury — Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence
**HABEAS CORPUS:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS — Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☑ 890 Other Statutory Actions

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

*Suit to recover attorney's fees pursuant to 20 U.S.C. §1415*

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23

DEMAND $*9,185.00*

CHECK YES only if demanded in complaint:
JURY DEMAND ☐ YES ☑ NO



DOCKETED
MAR 11 2004

## VIII. RELATED CASE(S) IF ANY (See instructions):
JUDGE _____ DOCKET NUMBER _____

DATE *3/10/04*

SIGNATURE OF ATTORNEY OF RECORD
*John Gaffney*

FOR OFFICE USE ONLY

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of

Lorna Woodall, et al.
V.

Board of Education, Belvidere Community Unit School Dist. 100, et al.

Case Number: 04C50130

FILED WID
2004 MAR 10 PM 3: 50
U.S. DISTRICT COURT

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Lorna Woodall

Benjamin Woodall

| (A) | (B) |
|---|---|
| **SIGNATURE** | **SIGNATURE** |
| **NAME** John Gaffrey | **NAME** |
| **FIRM** The Law Office of John Gaffrey | **FIRM** |
| **STREET ADDRESS** 103 W. Sumner St. | **STREET ADDRESS** |
| **CITY/STATE/ZIP** Harvard, Il. 60033 | **CITY/STATE/ZIP** |
| **TELEPHONE NUMBER** (815) 943-0900 | **TELEPHONE NUMBER** |
| **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** 6201141 | **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** |
| **MEMBER OF TRIAL BAR?** YES ☒ NO ☐ | **MEMBER OF TRIAL BAR?** YES ☐ NO ☐ |
| **TRIAL ATTORNEY?** YES ☒ NO ☐ | **TRIAL ATTORNEY?** YES ☐ NO ☐ |
| | **DESIGNATED AS LOCAL COUNSEL?** YES ☐ NO ☐ |
| (C) | (D) |
| **SIGNATURE** | **SIGNATURE** |
| **NAME** | **NAME** |
| **FIRM** | **FIRM** |
| **STREET ADDRESS** | **STREET ADDRESS** |
| **CITY/STATE/ZIP** | **CITY/STATE/ZIP** |
| **TELEPHONE NUMBER** | **TELEPHONE NUMBER** |
| **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** | **IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE)** |
| **MEMBER OF TRIAL BAR?** YES ☐ NO ☐ | **MEMBER OF TRIAL BAR?** YES ☐ NO ☐ |
| **TRIAL ATTORNEY?** YES ☐ NO ☐ | **TRIAL ATTORNEY?** YES ☐ NO ☐ |
| **DESIGNATED AS LOCAL COUNSEL?** YES ☐ NO ☐ | **DESIGNATED AS LOCAL COUNSEL?** YES ☐ NO ☐ |

DOCKETED
MAR 11 2004

**PLEASE COMPLETE IN ACCORDANCE WITH INSTRUCTIONS ON REVERSE.**